IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03029-CMA-NRN

CRAIG H. ROBERTS,

Plaintiff,

v.

DOUG BENSON,

Defendant.

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO AMEND COUNTERCLAIMS AND
SCHEDULING ORDER (Dkt. #39)
and
PLAINTIFF'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO
AMEND COMPLAINT TO SEEK EXEMPLARY DAMAGES (Dkt. #46)**

**N. Reid Neureiter
United States Magistrate Judge**

This case is before the Court pursuant to Orders (Dkt. ##40 & 47) issued by Judge Christine M. Arguello referring the following motions:

- Defendant/Counterclaim Plaintiff Doug Benson's ("Mr. Benson") Motion to Amend Counterclaims and Scheduling Order ("Mr. Benson's Motion to Amend") (Dkt. #39), to which Plaintiff/Counterclaim Defendant Craig H. Roberts ("Mr. Roberts") filed a response (Dkt. #48); and

- Mr. Roberts' Motion to Modify Scheduling Order and for Leave to Amend to Seek Exemplary Damages ("Mr. Roberts' Motion to Amend"), to which Mr. Benson filed a response (Dkt. #50), and Mr. Roberts filed a reply (Dkt. #51).

On January 10, 2023, the Court heard argument from the parties on Mr. Benson's Motion to Amend, and discussed Mr. Roberts' Motion to Amend, although it had not been fully briefed. Now, having taken judicial notice of the Court's file, considered the applicable Federal Rules of Civil Procedure and case law, and as set forth fully below, the Court **RECOMMENDS** that the Motions to Amend (Dkt. ##39 & 46) be **DENIED**.

## I. BACKGROUND

Judge Arguello recited the relevant factual background of this defamation lawsuit in her Order Denying Defendant's Motion to Dismiss (Dkt. #23), and further elaboration will only be included as necessary.

Briefly, the Bahama Beach Club ("BBC"), a condominium development on the Bahamas' Abaco Island, was damaged by Hurricane Dorian in September 2019. (Dkt. #1 ¶ 5.) Mr. Roberts is the President of Bahama Beach Club Holdings Ltd., and Mr. Benson was a condominium owner in the development and President of several phases. (*Id.* ¶¶ 5–7.) Mr. Benson opposed Mr. Roberts' rebuilding efforts after the hurricane. On June 6, 2020, he sent an email to approximately 50 individuals, many of whom Mr. Benson knew owned vacation property at the BBC. The email stated that Robert Pinder, an insurance agent of BBC's casualty insurer, Insurance Management Bahamas ("IMB"), viewed Mr. Roberts "as a bad risk and a moral blight on our community." (*Id.* ¶¶ 8–9, 11–12; Dkt. #1-1.) Mr. Benson sent out more emails on June 8, 2020, and June 15, 2020, stating, "Our Insurance Agent informed me that we are being cancelled because they viewed [Mr. Roberts] as a Bad risk, and a moral blight on our

2

community." (Dkt. ##1-2, 1-3.) Mr. Roberts alleges that Mr. Benson's comments were "fabricated" and defamatory per se.

Applying Florida law, Judge Arguello rejected Mr. Benson's arguments that Mr. Roberts' Complaint should be dismissed because the alleged defamatory statements constituted pure opinion and/or were substantially true. (*See generally* Dkt. #23.) Judge Arguello determined that the statements were not pure opinion because they included a factual allegation that *IMB* (as opposed to Mr. Benson personally) viewed Mr. Roberts as a bad risk and a moral blight, and the recipients of those statements had no reason believe otherwise. (*Id.* at 6–9.) She further found that it was inappropriate to decide whether the statements were substantively true on a motion to dismiss. (*Id.* at 9–10.)

Mr. Benson now seeks to amend his Answer and Counterclaim[1] (Dkt. #28) to assert a counterclaim for abuse of process. (*See* Dkt. #39-5.) Mr. Benson alleges that Mr. Roberts has a history of disputes with BBC owners who rent their units outside his rental pool, and that this lawsuit was brought for the ulterior purpose of forcing Mr. Benson to sell his condominiums. (*Id.* ¶¶ 35–41.) He also requests that the Scheduling Order (Dkt. #18) be amended to permit additional discovery.

Mr. Roberts likewise seeks to amend the pleadings. He wishes to assert a claim for exemplary damages because he believes Mr. Benson "acted with knowledge of the falsity of his statements, reflecting circumstances of malice or willful and wanton conduct." (Dkt. #46 at 1.) At the hearing and in briefing, Mr. Roberts' counsel confirmed that he would not seek additional discovery on this claim.

---

[1] Mr. Benson originally asserted one counterclaim for defamation. (*See* Dkt. #28 ¶¶ 31–34.)

3

The Court will address each motion in turn.

## II. ANALYSIS

**a. Mr. Benson's Motion to Amend (Dkt. #39)**

The deadline for joinder of parties and amendment of pleadings was April 22, 2022. (*See* Dkt. #18 at 8.) Thus, allowing either side to amend his pleading would mean modifying the Scheduling Order, which requires good cause. Fed. R. Civ. P. 16(b)(4) (A scheduling order "may be modified only for good cause and with the judge's consent.") "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014) (citing *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001)). This burden is satisfied, for example, when a party learns of new information in a deposition or that the governing law has changed. *Id.* Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order. *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000). The party seeking an extension is normally expected to show at least good faith on its part and some reasonable basis for not meeting the deadline. *Deghand v. Wal-Mart Stores, Inc.*, 904 F. Supp. 1218, 1221 (D. Kan. 1995).

If good cause to amend the Scheduling Order exists, the Court then turns to Rule 15(a)(2) which states, in relevant part, that "a party may amend its pleading only with the opposing party's written consent or the court's leave." Leave to amend shall be freely granted when justice so requires. *See, e.g.*, *Bellairs v. Coors Brewing Co.*, 907 F. Supp. 1448, 1459 (D.Colo.1995). "If the underlying facts or circumstances relied upon

4

by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, the court may exercise its discretion to deny a motion to amend upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by previously allowed amendments, or futility of the amendment. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal . . . . The relevant standard in determining whether claims are futile is the same standard that is applied to a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Dorough v. Am. Family Mut. Ins. Co.*, No. 15-cv-02388-MSK-KMT, 2016 WL 1426968, at *2 (D. Colo. Apr. 11, 2016).

Rule 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw

5

the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the Court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." Id. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

However, the Court need not accept conclusory allegations without supporting factual averments. *S. Disposal, Inc., v. Tex. Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does the complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id*. (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (citation omitted).

Even if the Court was satisfied for the purposes of this motion that Mr. Benson met his Rule 16 burden to modify the Scheduling Order to allow the late amendment of pleadings, the motion should still be denied because Mr. Benson's abuse of process claim is futile.

Judge Arguello has described the requirements to state a claim for abuse of process:

> Under Colorado law, a valid abuse of process claim must allege three elements: (1) an ulterior purpose for the use of a judicial proceeding; (2)

6

willful action in the use of that process which is not proper in the regular course of the proceedings, i.e., use of a legal proceeding in an improper manner; and (3) resulting damage. *Active Release Techniques, LLC v. Xtomic, LLC*, 2017 COA 14, ¶ 6 (quoting *Mackall v. JPMorgan Chase Bank, N.A.*, 2014 COA 120, ¶ 39), *reh'g denied* (Mar. 9, 2016), *cert. denied*, No. 17SC245, 2017 WL 3016420 (Colo. July 3, 2017).

The second element—"an improper use of the process"—is "[t]he essential element of an abuse of process claim." *Id.* (citing *Sterenbuch v. Goss*, 266 P.3d 428, 439 (Colo. App. 2011)); *see also James H. Moore & Assoc. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. App. 1994). The Colorado Court of Appeals has explained:

> Thus, although the litigant's motive may be important in determining whether there was an "ulterior purpose" for the use of the process, it still must be established that, viewed objectively, there was an improper use of the process. Classic examples of the requisite improper use include the use of process to accomplish a coercive goal which is not the intended legal purpose of the process.

*James H. Moore & Assocs. Realty, Inc.*, 892 P.2d at 373 (citing *Aztec Sound Corp. v. W. States Leasing Co.*, 510 P.2d 897 (1973); *Scozari v. Barone*, 546 So.2d 750 (Fl. Ct. App. 1989)). Expanding on this element, the Court of Appeals for the Tenth Circuit quoted from a treatise:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

*Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1118 (10th Cir. 2009) (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 121, at 898 (5th ed. 1984)).

*Pinon Sun Condo. Ass'n, Inc. v. Atain Specialty Ins. Co.*, No. 17-cv-01595-CMA-NRN,

2019 WL 4667994, at *5–6 (D. Colo. Sept. 25, 2019).

7

Mr. Benson argues that Mr. Roberts used this lawsuit as a "pretext" to force him out of the BCC.[2] But an abuse of process claim "focuses not on the alleged wrongdoer's motivations or intentions, but on whether or not he used the legal system for its intended purpose." *Active Release*, 413 P.3d at 212. "If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse, *even if the plaintiff had an ulterior motive* in bringing the action or if he knowingly brought suit upon an unfounded claim." *Id.* (emphasis added) (quoting *Sterenbuch*, 266 P.3d at 439). Thus, if a party files "claims that are colorable on their face, and requests relief consistent with the claims alleged," there is no abuse of process, even if the claims are factually baseless. *Partimer Worldwide Inc. v. Siliconexpert Techs. Inc.*, No. 09-cv-00586-MSK-MJW, 2010 WL 502718, at *3 (D. Colo. Feb 10, 2010) (footnote omitted); *see also Chaleph v. Canon City*, No. 13-cv-02166-NYW-KLM, 2015 WL 5093200, at *10–11 (D. Colo. Aug. 31, 2015) (no abuse of process if action is confined to regular and legitimate function, even if suit was knowingly brought on an unfounded claim).

In this case, Mr. Roberts alleges that Mr. Benson published a false statement about him to a third party that caused him injury. This claim was manifestly colorable, as it survived a motion to dismiss. Because the lawsuit was filed to accomplish a result available in litigation, any ulterior motive is incidental to the proceedings. *See Hertz*, 576

---

[2] Mr. Benson invites the Court to review a purported settlement offer by Mr. Roberts that he insists supports his claim. The Court, cognizant of Fed. R. Evid. 408, declines this invitation. *See Malibu Media, LLC v. Cuddy*, No. 13-cv-02385-WYD-MEH, 2015 WL 1040466, at *3 (D. Colo. Mar. 5, 2015) ("In light of the public policy favoring settlement of disputes, a plaintiff's engaging in settlement negotiations can not be a basis for an abuse of process claim.").

8

F.3d at 1118 ("[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive or spite or ulterior purpose of benefit to the defendant."). Mr. Benson has not adequately alleged that Mr. Roberts had an "improper purpose" in filing a lawsuit that has already overcome a Rule 12(b)(6) challenge. Accordingly, the Court **RECOMMENDS** that Mr. Benson's Motion to Amend (Dkt. #39) be **DENIED**.

**b. Mr. Roberts' Motion to Amend (Dkt. #46)**

Mr. Roberts seeks leave to amend his Complaint to include a demand for exemplary damages under Colorado law. That request should be denied.

Under Colorado state law, the requested remedy of exemplary damages may not be included in the initial complaint. Instead, to obtain leave to amend the pleadings to add a claim for exemplary damages, a plaintiff must satisfy two requirements: the parties must have exchanged initial disclosures, and the plaintiff must establish "prima facie proof of a triable issue" of exemplary damages. Colo. Rev. Stat. § 13–21–102(1.5)(a). The discovery process, not the initial pleadings, provides the requisite prima facie proof for exemplary damages. *See Stamp v. Vail Corp.*, 172 P.3d 437, 449 (Colo. 2007).

The Rule 15 and Rule 16 standards apply to a movant's untimely request to amend pleadings to add a claim for exemplary damages. *See, e.g., Fiechtner v. Amer. Family Mut. Ins. Co.*, No. 09–cv–02681–REB–MEH, 2010 WL 5185490, at *3 (D. Colo. Oct. 19, 2010); *Alarid v. Biomet, Inc.*, No. 14–cv–2667–REB–NYW, 2016 WL 309053, at *2 (D. Colo. Jan. 26, 2016); *Martin v. Amer. Family Mut. Ins. Co.*, No. 05–cv–00960–ZLW–BNB, 2007 WL 1159945, at *1 (D. Colo. Apr. 17, 2007). As a practical matter, this

9

means that if a plaintiff has diligently sought to develop the evidence sufficient to create a prima facie case for exemplary damages, learns new information through discovery, and has not unduly delayed in moving to amend once that evidence is collected, then good cause for the amendment is established. *See Affordify, Inc. v. Medac, Inc.,* No. 19-cv-02082-CMA-NRN, 2020 WL 6290375, at *3–4 (D. Colo. Oct. 27, 2020) (collecting cases).

Exemplary damages are permitted if it is shown that the defendant's actions resulted in injury "attended by circumstances of fraud, malice, or willful and wanton conduct." Colo. Rev. Stat. § 13–21–102(1)(a). Willful and wanton conduct is conduct that is "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or the rights and safety of others, particularly the plaintiff." *Id.* § 13-21-102(1)(b); *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005) (*citing Tri-Aspen Const. Co. v. Johnson*, 714 P.2d 484, 486 (Colo. 1986); *Frick v. Abell*, 602 P.2d 852, 854 (Colo. 1979)). In other words, conduct is willful and wanton if it is "a dangerous course of action" that is consciously chosen "with knowledge of facts, which to a reasonable mind creates a strong probability that injury to others will result." *Stamp*, 172 P.3d at 449 (*quoting Steeves v. Smiley*, 354 P.2d 1011, 1014 (Colo. 1960) (holding that evidence of a driver's decision to travel at a high speed and to pass other cars at night on a single-lane highway despite repeated warnings from his passengers that he was driving too fast was sufficient to present the question of willful and wanton conduct to the jury in a wrongful death action)). "Where the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory

10

requirements" are met. *Coors*, 112 P.3d at 66. "Malicious" conduct refers to "'an intention or desire to harm another [usually] seriously through doing something unlawful or otherwise unjustified' or 'revengeful or unfriendly feelings.'" *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 286 (Colo. App. 2010) (quoting *Webster's Third New Int'l Dictionary* 1367 (2002)).

In addition, it is well-settled that a plaintiff need only put forth evidence to establish a prima facie case of willful and wanton conduct to satisfy the requirements of § 13-21-102(1.5)(a). To make a prima facie case, a plaintiff need only demonstrate "a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution." *Stamp*, 172 P.3d at 449 (quoting *Leidholt v. Dist. Ct.*, 619 P.2d 768, 771 n.3 (Colo. 1980)). "Prima facie evidence is evidence that, unless rebutted, is sufficient to establish a fact." *Id.* A plaintiff need not respond to contrary evidence. *See RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 3055772, at *4 (D. Colo. May 10, 2018) ("At this stage of the litigation, the Court is only concerned with whether the evidence, when viewed in the light most favorable to Plaintiffs, is sufficient to make out a prima facie case of willful and wanton behavior for the purpose of allowing Plaintiffs to amend their Complaint to include exemplary damages, not whether such evidence is sufficient to defeat a motion for summary judgment or to result in a jury verdict in Plaintiffs' favor."); *Am. Econ. Ins. Co. v. William Schoolcraft, M.D., P.C.*, No. 05-cv-01870-LTB-BNB, 2007 WL 160951, at *4 (D. Colo. Jan. 17, 2007), ("I am concerned here only with the preliminary question of whether [the plaintiffs] have made a prima facie case under § 13-21-102(1.5)(a), not with summary judgment."). In connection with

deciding whether Mr. Roberts has established a prima facie case, the Court looks only to the evidence he provides, and views that evidence in the light most favorable to him.

In the defamation context, the Court also is sensitive that First Amendment considerations that come into play. "The interest in protecting an individual's reputation is not paramount in all circumstances. It must be weighed against society's interest in encouraging and fostering vigorous public debate, an interest protected by the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution." *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. App. 2008). The Colorado Supreme Court has recognized that it is important to place something of a buffer zone around speech to "honor the commitment to robust debate embodied in the first amendment and to ensure sufficient scope for first amendment values." *See Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1106 (Colo. 1982) (adopting reckless disregard standard in cases involving public officials, public figures, and matters of public or general concern); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974) ("The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms."). Because of the danger to the First Amendment and principles of free speech, awards of punitive damages in defamation cases are not available unless the plaintiff is able to satisfy the stringent requirement of actual malice. *Id.* at 350 ("In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury.").

According to Mr. Roberts, discovery has revealed that Mr. Benson attributed to Mr. Pinder false statements about Mr. Roberts and published those statements to others with at least reckless disregard as to the harm that would result to Mr. Roberts' reputation. As noted above, Mr. Roberts alleges that on at least three occasions, Mr. Benson emailed one or more individuals that Mr. Pinder and IMB viewed Mr. Roberts as "a bad risk" and a "moral blight on the community." (Dkt. ##1-1, 1-2, 1-3.) In his deposition, Mr. Pinder denied making these specific statements to Mr. Benson, and denied making any general statements about Mr. Roberts' moral character. (*See* Dkt. #46-1.) Mr. Roberts contends that this is sufficient to establish a prima facie case for leave to seek exemplary damages.

Although the Court agrees with Mr. Roberts that the bar for making a prima facie case is relatively low, it is not persuaded that Mr. Roberts cleared it here. The material attached to Mr. Roberts' Motion to Amend and the proposed Amended Complaint (Dkt. #46-2) itself shows that the BCC's insurance carrier was indisputably cancelling insurance coverage because it refused to insure the property if Mr. Roberts was going to be involved. This was communicated to Mr. Benson by the insurance representative. While Mr. Pinder denies calling Mr. Roberts a "moral blight on the community," he did testify that he told Mr. Benson that he considered Mr. Roberts "moral hazard," which he says is a "typical insurance term." (*See* Dkt. #46-1 at 5, Pinder Dep. 17:18–25.) Similarly, while Mr. Pinder denies telling Mr. Benson that Mr. Roberts was a "bad risk," Mr. Pinder testified that he and IMB "didn't want to do business with Craig Roberts if he was involved in the association's policy moving forward" because "the attitude [he] displayed was not something I think our company was wanting to proceed with into the

13

future." (*Id.*, 16:8–11; 14:1–5.) Regardless of whether Mr. Roberts was explicitly called a "bad risk," then, the undisputed evidence shows that Mr. Roberts was a hindrance on the BBC obtaining insurance coverage from Mr. Pinder and IMB.

In assessing whether these defamation allegations establish a prima facie case of willful and wanton or reckless conduct sufficient to justify an award of exemplary damages, the Court believes the analysis must include a comparison of Mr. Benson's knowledge of the likelihood of injury from the defamatory statements against what injury Mr. Roberts would have suffered had Mr. Benson accurately recited the undisputed comments of the insurance representative, and Mr. Benson's alleged conscious knowledge of that difference. After all, the test for exemplary damages in Colorado turns in part on whether Mr. Benson knew by his conduct that there was a "strong probability that injury" would result to Mr. Roberts. If reputational injury would still have occurred had Mr. Benson accurately recited the statements, or if Mr. Benson was not conscious that additional reputational injury would redound to Mr. Roberts because of the use of the words "moral blight" as opposed to "moral hazard," then there is no basis for an award of punitive damages.

In this instance, in the Court's view, there is minimal marginal additional reputational injury to Mr. Roberts from Mr. Benson's comments that IMB believed Mr. Roberts was a "moral blight" and a "bad risk," as compared to the statements that the insurers believed Mr. Roberts represented a "moral hazard" and were cancelling the policies because of the involvement in Mr. Roberts in the reconstruction project. In an effort to explain the difference between "moral hazard" and "moral blight," Mr. Roberts cites to the testimony of the insurance representative that the former phrase reflects

14

only "the character of the insured during the circumstances surrounding the subject matter of the insurance," as opposed to a comment on Mr. Robert's actual moral character. (*Id.*, 18:5–10.) This is incomprehensible gibberish. Regardless of whether it is a statement about his moral character or not, the insurers' representative was communicating that any involvement with Mr. Roberts would be enough to justify canceling any insurance policies—an important point and a black mark on Mr. Roberts' professional reputation.

Put differently, whether Mr. Roberts was explicitly called a "moral blight" and "bad risk," even the Amended Complaint's allegations and the material of which the Court can take notice show that Mr. Roberts was a hindrance on the BBC obtaining insurance coverage from Mr. Pinder and IMB. The Court views "bad risk" versus "we will not provide insurance if this individual involved" to be a distinction with little difference in this instance. Thus, use of the shorthand term "bad risk" in describing someone with whom an insurance company indisputably refuses to do business is not sufficient willful and wanton unlawful conduct to justify an award of exemplary damages.

So, even viewing the allegations in a light most favorable to Mr. Roberts, the Court finds that he has failed to make a prima facie showing that Mr. Benson was conscious of any additional injury the allegedly false statements would impose compared to the truth. Nor is there any evidence to suggest that Mr. Benson was reckless to the point of actual malice in making the allegedly false statements.

In short, the Court agrees with Mr. Benson that there is not a reasonable likelihood that Mr. Roberts' claim for exemplary damages will be submitted to a jury.

Amending the pleadings to add any such claim would be futile. For this reason, the Court **RECOMMENDS** that Mr. Roberts' Motion to Amend (Dkt. #46) be **DENIED**.

## IV. RECOMMENDATION

It is hereby **RECOMMENDED** that both Motions to Amend (Dkt. ##39 & 46) be **DENIED**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge,** *Thomas v. Arn***, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.** *Makin v. Colo. Dep't of Corr.***, 183 F.3d 1205, 1210 (10th Cir. 1999);** *Talley v. Hesse***, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated:   March 20, 2023
         Denver, Colorado            _____
                                     N. Reid. Neureiter
                                     United States Magistrate Judge