IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello

Civil Action No. 21-cv-03029-CMA-NRN

CRAIG H. ROBERTS,

    Plaintiff/Counter Defendant,

v.

DOUG BENSON,

    Defendant/Counter Claimant.

---

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant Doug Benson's Motion for Summary Judgment. (Doc. # 52.) For the following reasons, the Motion is denied.

## I.    BACKGROUND

This is a defamation suit arising from a dispute concerning a hurricane-damaged condominium development in the Bahamas. Unless otherwise indicated, the following material facts are undisputed.

The Bahama Beach Club ("BBC") on Abaco Island in the Bahamas is a condominium development consisting of five residential condominium phases ("Phases 1-5") and three garage phases ("Phases 6-8"). (Doc. # 52-1 at 2.) Phases 1-4 of the BBC have a total of 44 condominium units, which constitute approximately half of the residential units of the BBC, and a homeowner's association board. (*Id.*) Phase 5 also has 44 units and a separate homeowner's association board. (*Id.*) The BBC's common

areas, such as pools, sidewalks, restaurants, and parking lots, are managed by a third board called the Bahama Beach Club Owner's Association ("BBCOA"). (*Id.*)

Plaintiff Craig H. Roberts and Defendant Doug Benson are both condominium owners at the BBC. (Doc. # 52 at 1–2.) Defendant is and was at all relevant times the president of the homeowner's boards for residential Phases 1-4 and garage Phases 6-7. (*Id.*) Plaintiff is the President/Developer of Bahama Beach Club Holdings, LLC, which developed Phases 2-5 of the BBC in the early 2000s. (Doc. # 52-1 at 3.) It is undisputed that Plaintiff and Defendant have a "frosty" relationship and a "rocky history" stemming from other conflicts they have had in relation to the BBC. (Doc. # 53 at 5–8; Doc. # 54 at 1.) Defendant testified at his deposition that he personally views Plaintiff as "a bully," that the two of them have had "times that [their] relationship was quite antagonistic," that Plaintiff has done things to damage Defendant's good name and reputation at the BBC, and that Plaintiff has engaged in conduct that Defendant considers immoral. (Doc. # 53-1 at 8; 12, 13, 16.) Among other things, Plaintiff testified that Defendant stabbed him in the back, is a "rabble-rouser," and is "in the words of many people at the Bahama Beach Club, a cancer on our resort." (Doc. # 53-3 at 33.)

On September 1, 2019, Hurricane Dorian struck Abaco Island and caused major damage to the BBC. (Doc. # 52 at 5.) At the time, the BBC was insured by Insurance Management Bahamas Limited ("IMB"). (*Id.* at 7.) In February 2020, after several months passed and the claims process with IMB still had not yet resolved, the BBCOA designated Plaintiff as the lead negotiator with IMB to obtain a final settlement for the

Hurricane Dorian claim. (Doc. # 52-1 at 4.) In addition, the owners of condominium units in Phase 5 selected Plaintiff to be the developer for the rebuilding of Phase 5. (*Id.* at 5.)

Defendant actively objected to Plaintiff negotiating on behalf of the BBC on the basis that Plaintiff "exhibited animosity towards phase one through four." (Doc. # 53-1 at 6.) In his deposition, Defendant testified that Plaintiff "did not want to be involved in the rebuild of phase one through four because I was the President." (*Id.*) Defendant criticized Plaintiff being picked as the lead negotiator to the BBCOA president because "[Plaintiff] was the one negotiating" and because Defendant believed that Plaintiff would get Phase 5 more money than Phases 1-4. (*Id.* at 5.) Plaintiff contends, and Defendant does not genuinely dispute, that Plaintiff successfully negotiated a higher settlement with IMB. *See* (Doc. # 53 at 4; Doc. # 54 at 2.)

After Plaintiff negotiated a higher settlement, in approximately June 2020, the insurance relationship between IMB and the BBC terminated. The parties dispute the circumstances of the end of this insurance agreement, including whether IMB decided to cancel insurance coverage for the BBC or whether the BBCOA decided not to continue to insure with IMB and informed IMB as such on or about June 1, 2020. *Compare* (Doc. # 53 at 6), *with* (Doc. # 54 at 2).

During the same time frame, Defendant had been negotiating a contract with a company called DCK Construction to rebuild Phases 1-4. (Doc. # 53-1 at 9.) On June 1, 2020, Defendant sent an email to IMB insurance agent, Robert Pinder, inquiring whether he still had insurance coverage. (Doc. # 52-3 at 2.) Defendant then asked Mr.

3

Pinder to call him. (*Id.*) On June 2 or 3, 2020, Defendant and Mr. Pinder spoke by telephone. (Doc. # 52-4 at 2.)

The exact nature of what was said on the phone call between Defendant and Mr. Pinder is heavily disputed and critical to the defamation claim in this case. Mr. Pinder testified at his deposition that he told Defendant that if Plaintiff was overseeing the rebuild, then IMB would not continue to provide insurance coverage. (*Id.* at 2.) Mr. Pinder further testified that he explained to Defendant that "[IBM] didn't want to have further participation with Mr. Craig Roberts, so that's the reason we were canceling the policies." (*Id.* at 3.) Defendant, however, testified in his deposition that during the phone call, Mr. Pinder told him: "Mr. Benson, Insurance Management will not do business with Mr. Roberts or his related companies in any way, shape or form. We view him as a bad risk and, honestly, sir, he is a moral blight on your community." (Doc. # 53-1 at 4.)

Mr. Pinder denied ever stating that he viewed Plaintiff as a "bad risk"; that Plaintiff was a "moral blight" on the community; or that Plaintiff's moral character was bad. (Doc. # 52-1 at 3–5.) Mr. Pinder admitted that he "did tell Mr. Benson that we considered Mr. Roberts to be a moral hazard and that's why we weren't moving forward with the insurance." (*Id.* at 5.) However, Mr. Pinder explained that "moral hazard" is "insurance terminology," and he stated that "we define moral hazard in the insurance industry as some measurement – the defining of the character of the insured during the circumstances surrounding the subject matter of the insurance, meaning the policies that we had." (*Id.* at 5–6.) He testified that considering someone a "moral hazard," as an insurance term, is different than considering them a "bad risk." (*Id.* at 10.)

4

When asked about Mr. Pinder's deposition testimony denying that he had expressed that Plaintiff was a "bad risk" or "moral blight," Defendant testified as follows:

Q. You attended Mr. Pinder's deposition taken last week, correct?

A. Yes, I did.

Q. And you heard Mr. Pinder's sworn testimony throughout that deposition?

A. I did.

Q. You heard Mr. Pinder expressly deny ever having described Craig Roberts as a moral blight on any community, correct?

A. I heard him say he was a moral hazard.

Q. Did you hear him expressly deny ever having said that Craig Roberts was a moral blight on your community?

A. Yes, in answer to your question.

Q. And you are disagreeing under oath with that sworn testimony that Mr. Pinder gave, correct?

A. That's correct.

Q. You are stating, without equivocation, that the words that Robert Pinder spoke were that Craig Roberts is a moral blight on your community, correct?

A. That was part of what he told me, yes.

Q. You specifically deny that Mr. Pinder used the phrase moral hazard as opposed to moral blight on your community, correct?

A. That's true.

(Doc. # 53-1 at 4.)

Shortly after the phone call, on the evening of June 6, 2020, there was to be a meeting with the Phase 1-4 owners regarding hiring DCK Construction for the rebuild.

5

(*Id.* at 9.) On the morning of the meeting, Plaintiff—who had already been selected to lead the rebuild of Phase 5—submitted a proposal to each of the 44 owners in Phases 1-4 to be the developer for the reconstruction of those phases as well. (*Id.*) A few of those owners then emailed Defendant, as the president of the board for Phases 1-4, to state that they wanted Plaintiff's proposal included in the evening discussion about DCK so that they could vote on whether to hire DCK or Plaintiff. (*Id.*) On June 6, 2020, Defendant sent the following email to the owners of units in Phases 1-4:

> After receiving Craig's proposal I reached out to Robert Pinder, our insurance manager at Insurance Management to inquire as to whether Insurance Management would insure Phases 1-4 if we selected Mr. Roberts as our contractor. **Mr. Pinder called and we spoke. He was very clear, that Insurance Management and its carriers, will not insure Craig Roberts or any of his related companies under any circumstances, and do not want to do business with him, "in any way, shape or form". Mr. Pinder views Mr. Roberts as a bad risk and a moral blight on our community.** As such, as a Board member and fiduciary, I cannot in good conscious present Mr. Robert's [sic] proposal to you for consideration.

(Doc. # 1-1.) Defendant therefore did not allow consideration of Plaintiff's proposal at the meeting, and membership did not vote on it. (Doc. # 53-3 at 4.)

On June 15, 2020, Defendant sent another email to an attorney of one of the Phase 1-4 owners who wanted Plaintiff to be hired as the developer for the Phase 1-4 rebuild. (Doc. # 1-2.) In that email, Defendant wrote, "Our Insurance Agent informed me that we were being cancelled because they viewed Mr. Roberts as a BAD risk, and a moral blight on our community." (*Id.* at 2.)

Plaintiff initiated this lawsuit on November 10, 2021. (Doc. # 1.) He asserts one claim for defamation against Defendant arising from Defendant's statements that Mr.

6

Pinder and/or IMB "viewed Mr. Roberts as a BAD risk, and a moral blight on our community." (*Id.* at 4.) On June 28, 2022, Defendant filed a counterclaim against Plaintiff for defamation. (Doc. # 28 at 10.)

Defendant filed the instant Motion for Summary Judgment on January 30, 2023. (Doc. # 52.) Therein, he argues that he is entitled to summary judgment on Plaintiff's defamation claim because the "gist" or "sting" of Defendant's statements in the emails was substantially true and because the statements are privileged on the basis of Defendant's role as a fiduciary. The matter is fully briefed and ripe for review. (Doc. # 53; Doc. # 54.)

## II.     LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

### III.   DISCUSSION

For purposes of this Motion, Defendant concedes that Florida law applies. (Doc. # 52 at 9; Doc. # 53 at 9.) The Court will first address Defendant's "substantial truth" affirmative defense and then the issue of privilege.

### A. SUBSTANTIAL TRUTH

To prevail on a defamation claim under Florida law, a plaintiff must prove the following elements: (1) publication; (2) falsity; (3) that the defendant acted at least negligently as to the falsity of the publication on a matter concerning a private person; (4) actual damages; and (5) that the statement was defamatory. *Jews For Jesus, Inc v. Rapp*, 997 So. 2d 1098, 1105–6 (Fla. 2008); *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment. *Turner*, 879 F.3d at 1262 (citing *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985)). "Falsity" exists only if the publication is "substantially and materially false, not just if it is technically false." *Kieffer v. Atheists of Fla., Inc.*, 269 So. 3d 656, 659 (Fla. Dist. Ct. App. 2019) (quoting *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 707 (Fla. Dist. Ct. App. 1999)).

"Substantial truth" is an affirmative defense for which the defendant bears the burden of proof. *See Glickman v. Potamkin*, 454 So. 2d 612 (Fla. Dist. Ct. App. 1984). Under this doctrine, "a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Smith*, 731 So. 2d at 706. In addition to establishing that the statement was substantially true, a defendant must show that the statement was made with "good motive." *Lipsig v. Ramlawi*, 760 So. 2d 170, 183 (Fla. Dist. Ct. App. 2000); *see also Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. Dist. Ct. App. 1978) (holding that "the truth of the publication is a good defense, assuming that it was made with good motives"). Under Florida law, determining truth and good motive is a

matter for the jury. *Lipsig*, 760 So. 2d at 183 ("The law is clear that *both* truth and good motives are issues for the jury."); *Glickman*, 454 So. 2d at 612 ("In a defamation action, the affirmative defenses of truth, good motive and qualified privilege present factual questions for resolution by the jury.").

In the instant case, Defendant argues that his statement in the June 6, 2020 email that "Mr. Pinder views Mr. Roberts as a bad risk and a moral blight on our community" is substantially true. (Doc. # 52 at 9–17.) Defendant contends that the "gist" or "sting" of the statement is substantially similar to the views that Mr. Pinder stated during their phone call on June 1 or June 2, 2020, and Defendant points to his own and Mr. Pinder's deposition testimony in support. In response, Plaintiff argues that summary judgment is not appropriate because the parties dispute *what* Mr. Pinder said on the phone call, so "truth" must be determined by the jury. (Doc. # 53 at 12.) Moreover, Plaintiff disputes that Mr. Pinder stated any views that Plaintiff was a "bad risk" or a "moral blight" and contends that even if Mr. Pinder used the term "moral hazard"—which is disputed—such a term is an insurance term of art and does not have the same meaning to the listener as "bad risk" or "moral blight on the community."

The Court agrees with Plaintiff that significant, genuine disputes of material fact preclude summary judgment on Defendant's "substantial truth" affirmative defense. Critically, the parties vehemently dispute several statements that Mr. Pinder allegedly said during the phone call with Defendant on June 1 or June 2, 2020. For example, although Mr. Pinder testified that he never called Plaintiff a "bad risk" or a "moral blight" on the community, Defendant insisted at his deposition that Mr. Pinder used precisely

those words to describe Plaintiff. The Court is also unable to evaluate Defendant's argument that "moral hazard" has the same meaning as "bad risk" or "moral blight" because the deposition testimony reveals a genuine dispute of material fact as to whether Mr. Pinder used the term "moral hazard" at all. Indeed, Defendant specifically denied during his deposition that Mr. Pinder ever said the phrase "moral hazard." (Doc. # 53-1 at 4.) It is a matter for the jury to evaluate the credibility of these witnesses and determine whether Defendant's emailed statements were a substantially true approximation of Mr. Pinder's stated views of Plaintiff.

The Court finds that the genuine disputes of material fact precluding summary judgment include, but are not limited to:

- whether Mr. Pinder expressed that Plaintiff is a "bad risk" and/or a "moral blight on the community" during the phone call with Defendant on June 1 or 2, 2020;
- whether Mr. Pinder called Plaintiff a "moral hazard" during that same phone call;
- whether Mr. Pinder said anything during the phone call that would cause the listener to understand that Mr. Pinder viewed Plaintiff's moral character as bad; and
- whether Mr. Pinder said anything during the phone call that would cause the listener to understand that Mr. Pinder believed Plaintiff to be a "bad risk."

Because of these and other genuine disputes of material fact, the Court finds that the truth of what was said during the June 1 or June 2, 2020 phone call is an issue

appropriately reserved for the jury. *Lipsig*, 760 So. 2d at 183. Defendant is therefore not entitled to summary judgment on his affirmative defense under the substantial truth doctrine.

**B.     PRIVILEGE**

Defendant also asserts that the Court should grant summary judgment because his statements are privileged by virtue of his fiduciary role as the president of the board for Phases 1-4. Under Florida law, a statement "made by one who has a duty or interest in the subject matter to one who has a corresponding duty or interest" is qualifiedly privileged. *Schreidell v. Shoter*, 500 So. 2d 228, 230 (Fla. Dist. Ct. App. 1986). Where a qualified privilege exists, a plaintiff "must prove express malice or malice in fact in order to recover." *Id.* A plaintiff may prove that a defendant acted with malice by presenting evidence from which the jury could reasonably infer that the defendant was motivated by ill will and a desire to harm the plaintiff. *See id.* at 231.

The Court finds that Plaintiff has presented a genuine dispute of material fact as to whether Defendant acted with malice when he made the statements at issue in this case. In an effort to establish malice, Plaintiff points to evidence of the parties' contentious relationship, their past disputes, Defendant's objection to Plaintiff acting as the lead negotiator with IMB, and the circumstances of the June 6, 2020 board meeting and Plaintiff's proposal to rebuild Phases 1-4. A reasonable jury viewing this evidence in the light most favorable to Plaintiff could determine that Defendant's primary motive in making the statements was ill will and a desire to harm Plaintiff, rather than a good faith desire to protect the interests of the condominium owners. The Court therefore

concludes that summary judgment on the issue of qualified privilege is not appropriate and that the matter should properly be reserved for the jury. *See Glickman*, 454 So. 2d at 612 (stating that the affirmative defense of qualified privilege presents a factual question for resolution by the jury).

## IV. CONCLUSION

For the foregoing reasons, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 52) is DENIED.

DATED: May 25, 2023

BY THE COURT:

*[signature]*
CHRISTINE M. ARGUELLO
Senior United States District Judge